UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
        v.                        )     CRIMINAL NO. 04-30046-MAP
                                  )
ALBERT INNARELLI, et al.          )
                                  )
                  Defendants.     )

GOVERNMENT'S OBJECTIONS TO DEFENDANTS' MOTIONS TO CONTINUE

    The United States of America, by Michael J. Sullivan, United
States Attorney for the District of Massachusetts, moves this
Court, and William M. Welch II, Assistant United States Attorney,
hereby responds to defendants' Motions to Continue the sentencing
dates as follows:

    The defendants, and in particular defendant Albert
Innarelli, complain that the court must continue their
sentencings because they do not have all of the information
supporting the Government's Probation Memorandum or that the
Government was tardy in producing this information.  Incredibly,
defendant Innarelli asks for a *four month* continuance in order to
prepare more fully for his sentencing.  As outlined below, none
of these assertions are correct, and the court should not
continue the sentencings of any of the defendants.

    The defendant's main objection appears directed at
Attachment A, the Government's compilation of 292 loans.  Based
on Attachment A, the Government attributes the full amount of the

1

gross fraud figure to four defendants:  defendant Innarelli,
defendant Matos, defendant Bergdoll, and defendant Romeo.[1]
Attachment A is based primarily on five sources of information:
registry of deed records; defendant Innarelli's IOLTA account;
loan files; witness interviews; and co-conspirator interviews.
Each one of those sources of information has been available to
the defendants at least since May 17, 2006, the date that the
Court ordered the Government to produce all of the information
upon which it intended to rely for sentencing.  As explained
below, some of these sources of information have been available
for a much longer period of time.

   1. <u>Registry of Deed Information</u>

   The registry of deed records are public records, and have
been available to the defendants since indictment in September,
2004.  Indeed, the Hampden County Registry of Deeds has an
electronic database that allows the defendants to research real
estate purchases and sales via a website.  The Hampden County
Registry of Deeds is the source of information for the purchase
date information in Attachment A, and also corroborates the

---

[1]The Government also has attributed the full amount of the
fraud to defendant Frederick, one of the appraisers in the
scheme.  However, given the fact that defendant Frederick was not
part of the cabal of five -- defendants Bergdoll, Matos, Romeo,
Elliott Beals, and George Petropolous -- and played a much less
central role than those individuals, the Government most likely
will adopt the Probation Office's recommendation that the loss
figure be confined only to those properties that defendant
Frederick appraised.

closing date information of defendant Innarelli's IOLTA account.

2. <u>IOLTA Account</u>

Defendant Innarelli's IOLTA account, including the underlying bank statements and checks, has been available to the defendants' since September, 2004. The Government also took the extra step of copying defendant Innarelli's IOLTA check register and sending it to all of the defendants. By November 17, 2005, the Government had produced individual copies of defendant Innarelli's IOLTA check register to all of the defendants.

Attachment A is defendant Innarelli's IOLTA check register edited to exclude extraneous or irrelevant check entries. By dong so, the Government reduced an approximately 400 page document to an approximately forty page document. Any checks written for recording fees, title insurance, water and sewer taxes, and other types of fees or payments not relevant to the present case were redacted. All of the other information contained within Attachment A, such as check dates, check numbers, payees, and information contained on the memo line of the checks, came directly from defendant Innarelli's IOLTA check register. Where italicized information appears in the memo section column, this is identifying information not originally found in defendant Innarelli's IOLTA check register, but rather added by the Government based upon witness interviews or the Hampden County Registry of Deeds.

3

Ultimately, defendant Inanrelli's IOLTA check register and consequently Attachment A were corroborated by investigating agents. They did so by comparing the IOLTA check register to the original IOLTA bank statements and original IOLTA checks, subpoenaed loan files establishing a particular defendant's involvement in a particular real estate transaction, witness or co-conspirator interviews files establishing a particular defendant's involvement in a particular real estate transaction, and the recorded purchasers and sellers of a particular real estate transaction per the Hampden County Registry of Deeds. The investigating agents found defendant Innarelli's IOLTA account to be accurate and reliable.

   3. <u>Loan Files</u>

The Government made all of its loan files available since September, 2004. The defendants decided what they wanted to copy and what they did not want to copy. The Government never restricted their access to any of the loan files. If, for whatever reason, a defendant chose not to copy certain loan files, then they did so at their own peril.

The Government put all four of the defendants on notice that it intended to hold them responsible for the full amount of the gross fraud. As early as November 17, 2005, the Government produced a summary chart, which listed all of the properties in alphabetical order, for which the Government intended to hold the

4

four defendants accountable.  This summary chart, which listed
well over 250 properties, had been generated from defendant
Innarelli's IOLTA account.

Defendants Innarelli, Bergdoll, and Matos pled guilty to a
fraud range of $7,000,000.00 to $20,000,000.00, while defendant
Matos pled guilty to a fraud range of $2,500,000.0 to
$7,000,000.00.  While the plea agreement afforded them the right
to argue against that figure, it was no secret to any of the
defendants that the Government intended to argue for the full
amount of the gross fraud.  Indeed, the defendants conceded as
much in their Memorandum of Law regarding Loss Calculation where
they acknowledged that the Government intended to argue that the
loss figure equaled the full amount of the gross loans.

4. <u>Witness Interviews</u>

As of May 19, 2006, consistent with the court's order, the
Government produced all of the witness interviews in its
possession.  In fact, the Government had begun to produce these
materials as early as a year ago.  The defendants now have had
the universe of witness interviews possessed by the Government
for at least three months.

5. <u>Co-conspirator Interviews</u>

As of May 19, 2006, consistent with the court's order,
the Government produced all of the co-conspirator interviews as
well as impeachment information.  Once again, the Government had

produced some of these materials as early as a year ago.  The defendants now have had the universe of co-conspirator interviews for at least three months.

Defendant Innarelli complains that, given the 292 loans referenced in Attachment A, he now must make copies of another 100 plus loan files.  The short answer to his concern is that the Government does not possess loan files for all 292 loans. Instead, for those real estate transactions for which the Government does not have a loan file, the Government has attributed those real estate transactions under a joint liability theory to the defendants based upon other information.

For example, if the property had been bought and sold on the same day according to the Hampden County Registry of Deeds, then that loan is properly attributable to them as a fraudulent loan. The reason for this is because the lending institutions like Equicredit had a "seasoning" condition that required an owner to own the property for a full year before Equicredit would agree to finance a subsequent sale of the property.  Various co-conspirators, corroborated by other loan files, stated that the defendants, primarily with the assistance of defendant Innarelli, routinely falsified title information in closing files to circumvent the seasoning requirement.  Therefore, Equicredit never would have issued the loan but for the fraud involving the false title information.

Similarly, many of the properties had second mortgages associated with them according to the Hampden County Registry of Deeds. Various co-conspirators, corroborated by witness interviews and other loan files, stated that the defendants, including defendant Innarelli, told buyers not to worry about the second mortgages. The net effect of these fraudulent second mortgages was that, when coupled with non-existent down payments, lending institutions unwittingly issued loans that financed either 95% or 100% of the purchase of the property. The lending institutions never would have issued such loans given that they typically only financed up to 80% to 90% of the value of the property. Therefore, the lending institutions never would have issued the loan but for the fraud involving the false second mortgages.

The reality was that this land flipping scheme, as proven by the 100 plus loan files that the Government does possess, the 75 plus witness interviews conducted by investigators and disclosed to the defendants, and numerous co-conspirator interviews, was akin to a giant "boiler room" operation. The defendants processed the fraudulent real transactions in the same manner over and over again out of defendant Innarelli's office. Under a preponderance of the evidence standard, given the "boiler room" characteristics of this fraud, the manner in which the Government has proven those characteristics, and other information available

to the Probation Office and the court, it is entirely reasonable and permissible for the Government and the court to attribute other property transactions to the defendant even if the actual underlying loan files does not exist, especially since the closings for the property transactions ultimately were handled by defendant Innarelli and through his IOLTA account.

Finally, the defendants complain that the Government should have produced its Statement of Facts to the Probation Office and Attachment A much earlier. The short answer to that question was that, given the scope of the fraud, it was impossible to prepare the Statement of Facts in a timely manner. The Government remained in consultation with the Probation Office regarding the propriety of a later disclosure.

Moreover, the defendant had delayed filing their Memorandum of Law regarding Calculation of Loss until July 28, 2006. The Government had hoped that it could achieve some common ground with the defendants on the issue of loss, and, therefore, had waited for that filing to see how the defendants intended to calculate loss. Given the serious deficiencies in the law and logic behind the defendants' methodology, the Government proceeded apace with its own methodology and eventually disclosed its Probation Memorandum to the U.S. Probation Office and defendant Innarelli on August 8, 2006. The fact remains, however, that all of the information in that Probation Memorandum

8

had been in the hands of all of the defendants since at least May 19, 2006.

Therefore, based upon the foregoing, the Government requests that the court deny the defendant's Motions to Continue.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


By:
     /s/ William M. Welch II
     WILLIAM M. WELCH II.
     Assistant U.S. Attorney

9

<u>CERTIFICATE OF SERVICE</u>

Hampden,  ss.                          Springfield, Massachusetts
                                       August 25, 2006

     I, William M. Welch II, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing by electronic
filing on all counsel of record.


                              <u>/s/ William M. Welch II</u>
                              William M. Welch II
                              Assistant U.S. Attorney