## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES

vs.                                            Criminal No. 04-CR-30046-07-MAP

MARK McCARTHY

### DEFENDANT, MARK McCARTHY'S,
### SENTENCING MEMORANDUM

The Defendant, Mark McCarthy, respectfully submits his Sentencing Memorandum in support of his request that the Court Sentence him to a split sentence of imprisonment and home detention. In addition, the Defendant respectfully requests that the Court permit him to self-surrender to the institution designated by the Federal Bureau of Prisons as the place where the Defendant is to serve any term of imprisonment imposed by the Court. Finally, the Defendant respectfully requests that this Court recommend to the Bureau of Prisons that the Defendant be designated to the Federal Institution at Devens, Massachusetts. Said institution includes a satellite camp housing minimum security inmates, as well as a Federal Medical Center, and Defendant poses no security risk and has physical and mental health issues which are currently being treated by prescriptions, but may be exasperated requiring additional treatment.

## I.    OFFENSE BACKGROUND

Subject to the Objections made by Mark McCarthy to the Pre-Sentence Report ("PSR"),
the PSR provides a fair background of the offenses in this case. Insofar as the description of the
offenses set forth in the PSR relate to Mark McCarthy, the following offense background is
material and relevant to the rendering of a Sentence in this case.

As described in the PSR, several individuals began to perform fraudulent real estate
transactions known as "land flips." These individuals included such ring leaders as Elliot Beals,
George Petropolous, Michael Bergdoll, Anthony Matos and Pasquale Romeo, who perpetuated a
scheme involving buying properties at low prices then selling them at higher prices based upon
inflated appraisals. In order to effectuate these transactions, the ring leaders formed "business
relationships" with other individuals, such as attorneys, real estate appraisers and mortgage
brokers. The ring leaders would find "buyers" for their properties (directly or by use of
"runners"), and refer them to their attorneys, appraisers and mortgage brokers. Depending on the
circumstances in the particular transaction, in addition to the inflated appraisals, falsified
documents relating to income, down payment, may be used to obtain the loan.

Mark McCarthy was a "loan originator" employed by a mortgage broker. A mortgage
broker is not employed by lenders, does not lend money, or decide whether a particular loan will
be approved by a lender. Rather, a mortgage broker locates potential lenders for the buyer, and
assists with the preparation of loan applications to these lenders. In general, mortgage brokers
have hundreds of mortgage lenders available to submit loan applications to, depending on the
borrower's needs, credit, and income. The mortgage broker is paid a fee by the borrower or the
lender when the mortgage closes. As a "loan originator," Mark McCarthy compiled the
documentation that was submitted by the mortgage broker to these various lending institutions.
If possible, a loan originator has even less *discretionary authority* regarding whether a particular
loan will be approved by a lending institution than a mortgage broker.

2

Mark McCarthy first became involved in these land flipping transactions when the ringleaders started referring their buyers to him. At first, so far as Mark knew, the transactions were legitimate. As a loan originator, he had no idea of the condition of the property that was the subject of a sale, or whether an appraisal was inflated. In the beginning, if a particular buyer was facing problems with obtaining approval for a loan, the ring leaders performed the fraudulent acts with the buyers as to income, down payment, etc. He believed that the ringleader's business strategy was to buy properties in disrepair, fix up and repair these properties to improve their value, then sell the properties at a profit. Over time, Mark began to perceive that some of these buyers were providing him with false documentation, probably with the assistance of the ringleaders. Mark did not question these transactions. He was afraid of losing business if he questioned or withdrew from these transactions. He had a wife and two very young children to support, and had gone through financial distress leading to bankruptcy in the past. He did not want to go through that again, particularly given his family responsibilities.[1]

As Mark's business relationship continued with the ringleaders, they began asking him at times to prepare false documentation with the buyers in order to obtain loan approval. Mark acceded to these requests, and directly participated in the preparation of the false loan applications submitted to the various lending institutions.

At this point Mark still did not have direct knowledge of the condition of the properties that the ringleaders were referring buyers to him, although he knew generally that they were often in disrepair. Mark thought that he could also find properties in disrepair, improve the properties and sell them at a profit. To a much lesser extent than the ringleaders, Mark began to also get involved with buying properties, with the intention of repairing these properties and selling them

---

[1]     Mark also had a long mental health history of panic attacks, for which he had undergone therapy with psychiatrists and was taking prescription medication at that time through to the present. Mark does not assert that his mental health condition led or caused him to conduct these criminal activities.

3

at a profit. Frequently he did make repairs to the properties, or provide funds to the buyers to make such repairs as part of the transaction. In one case, he paid the buyer's mortgage pending the repairs to be made by him. However, in order to effectuate these purchases and sales, Mark continued to involve himself in the fraudulent loan process as described above.

## II.   SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the United States Supreme Court held that the Sentencing Guidelines, which have controlled sentencing in the federal courts for the past eighteen years, are unconstitutional. Id. The Court severed the unconstitutional portion of the Sentencing Guidelines from the Federal Sentencing Act, thereby rendering the Sentencing Guidelines as advisory. Id. In Booker, Justice Breyer concluded that "without the mandatory provision, the Act nonetheless requires judges to take account of the Guideliens together with other sentencing goals." Id., citing, 18 USCA § 3553(a).

Hence, the sentencing judge is required to consider all of the § 3553(a) factors including the Guidelines, but did not require the Court to give any more or less weight to the Guidelines than any other factor. Hence, the Court is to impose a sentence which is "sufficient, but not greater than necessary" to accomplish sentencing purposes. Id. Following this parsimony principle, the Court must determine whether a sentence above, within or below the Guidelines Sentencing Range is warranted. United States v. Alli, 444 F.3d 34, 40 (1st Cir. 2006).

With regard to the Guidelines calculation, the Defendant, Mark McCarthy, agrees with the United States District Court Probation Department's determination that USSG § 2S1.1(a)(1) provides that the base offense level for the Money Laundering offense is determined by the offense level for the underlying offense from which the "laundered" funds were derived, and that the underlying offenses in the present case are governed by USSG § 2B1.1 – which assigns a base offense level of six (6). However, the Defendant asserts that the Probation Department

4

erred in its overall calculation of the Guidelines Sentencing Range for reasons that:

a) the Probation Department erred by assessing an sixteen-level increase on the grounds that under USSG § 2B1.1(b) the "Specific Offense Characteristics" involved a loss which exceeded $1,000,000, but was less than $2,500,000;

b) the PSR incorrectly applies a two level enhancement under USSG § 2B1.1 on the grounds that the offense involved more than 10 but less than 50 victims;

c) the PSR incorrectly applies a two level enhancement under USSG § 3B1.3 on the grounds that the defendant abused a position of public or private trust;

d) the PSR fails to incorporate a two level downward adjustment on the basis that he was a "minor participant" among the individuals involved in the offense under USSG § 3B1.2.

## A.    THE PROBATION DEPARTMENT ERRED BY ASSESSING AN SIXTEEN-LEVEL INCREASE ON THE GROUNDS THAT UNDER USSG § 2B1.1(b) THE "SPECIFIC OFFENSE CHARACTERISTICS" INVOLVED A LOSS WHICH EXCEEDED $1,000,000, BUT WAS LESS THAN $2,500,000

Applying the *Starnes* method for loss calculation under USSG § 2B1.1(b) the "Specific

Offense Characteristics," the Probation Department calculated that the total amount of loss in this

case was **$1,120,350.**

The *Starnes* method provides that loss is calculated by determining the total amount of

the fraudulent loan less the purchase price paid by the conspirators. The intention of the method

is to correctly evaluate the amount of "actual loss" to the lender, which is appropriate in such

cases where the amount of fraudulently obtained proceeds is secured by collateral. See, e.g.,

United States v. Haggert, 980 F.2d 8 (1st Cir. 1992), and its progeny. However, when the

purpose behind the test is frustrated (i.e., to accurately evaluate "actual loss"), adjustment to the

*Starnes* method should be made when rote application of the method unfairly underestimates the

amount of collateral which secured the loan. For example, there is a property, 102-104 Cedar

Street, for which the Probation Department erroneously deducted a purchase price of only one

5

dollar ($1.00). Upon information and belief, this property had been owned by Co-Defendant, Romeo, for a number of years through an inheritance from his family. Although the transaction giving rise to this count involved fraud, it was **not** a "flipped" property in that this transaction was not undertaken in the same course of conduct as the majority of transactions included in the Superseding Indictment. By not accounting for the value of this property as collateral for the loan, the loss calculation has been inflated unfairly by the inclusion of the loan amount with only a paltry deduction of one dollar ($1.00). Likewise, when the actual amount of loss suffered can be accounted for through foreclosure sale, the deduction of the foreclosure price more accurately evaluates the amount of loss to the lender.[2] The inadvertent lack of deduction from the loan amount by the property's value at that time has caused the loss to be overstated, and the Sentencing Enhancement under USSG § 2B1.1(b) unwarranted and unsupported by the record evidence.

## 1. Deduction of Foreclosure Price Instead of Purchase Price from the Fraudulent Mortgage Amount Should Be Made When Such Information Is Available Because Foreclosure Value More Accurately Determines the Amount of "Actual Loss" Suffered by the Lender

It is a well established that in order to determine the amount of "loss" for application of the Sentencing Guidelines in "mortgage fraud" cases, credit must be calculated and applied for:

> a) the money returned, and the fair market value of property returned and the services rendered, by the Defendant or other persons acting jointly with the Defendant, to the victim(s) before the offense was detected; and
>
> b) in a case involving collateral pledged or otherwise

---

[2] The Defendant does not suggest that loss should be adjusted for "interest" paid, etc., *because these payments do not reflect the value of the collateral.* However, the foreclosure sale price does provide direct evidence of the collateral's worth, which should be deducted from the mortgage amount to determine the lender's "actual loss." Sometimes the foreclosure price will be less than the purchase price; sometimes greater. In any event, the foreclosure price more accurately assess the collateral's value for determining "actual loss."

6

provided:

i) the amount the victim has recovered at the time of sentencing from disposition of collateral, and

ii) for collateral that has not yet been disposed of, the fair market value of the collateral at the time of sentencing.

In other words, a determination must be made of the "actual loss" or "actual risk of loss"

incurred by the mortgage fraud as of the time of sentencing. This is the rule under the prior

Guidelines provision, Guideline § 2F1.1 (as well as Guideline § 2B1.1 (Application Note 3(E))

and numerous federal decisions.

This principle was succinctly explained in United States v. Haggert, 980 F.2d 8 (1st Cir.

1992),[3] which held:

> In fraudulent loan application cases and contract procurement cases where the defendant's capabilities are fraudulently represented, the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan.

Id.

The commentary to § 2F1.1 also instructs (again similarly to Guideline § 2B1.1,

Application Note 3) that to calculate the loss in a fraudulent loan case, the sentencing court starts

by taking "the amount of the loan not repaid at the time the offense is discovered, reduced by the

amount the lending institution has recovered (or can expect to recover) from any assets pledged

to secure the loan."[4]

---

[3]  Applying Application Note 7(a) of prior Guideline § 2F1.1, which was apparently incorporated into Note 3 of Guideline § 2B1.1, reflecting the "actual loss principal."

[4]  Apart from the Sentencing Guidelines, deducting the amounts repaid and the value of security given pursuant to the fraud is described as the "economic reality approach" for

In <u>United States v. Chorney</u>, 63 F.3d 78 (1st Cir. 1995), the Court further explained the

principal behind Comment 7 to § 2F1.1 (which is likewise enunciated in Comment 3 to § 2B1.1):

> Where a bank loan is fraudulently procured, the original loan or the
> outstanding balance is a presumptive proxy for the actual or
> threatened loss. Reducing that amount by the value of assets
> pledged to the lender reflects the fact that the real sum at risk for
> the lender is the difference between the amount loaned and the
> collateral.

<u>Id.</u>

In the present case, the *Starnes* Method is a fair gauge of "expected loss" or "threatened

loss", because it uses the purchase price to give an approximate value of the collateral. However,

exclusive use of the purchase price should not be inflexibly applied when there is a better

determiner of value to calculate "actual loss."

In <u>United States v. Bennett</u>, 37 F.3d 687 (1st Cir.1994), the Court held, "in fraudulent

loan application cases and contract procurement cases, the loss is the actual loss to the victim (or

if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently

obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not

repaid at the time the offense is discovered, reduced by the amount the lending institution has

recovered (or can expect to recover) from any assets pledged to secure the loan." <u>Id.</u>, citing,

<u>United States v. Menichino</u>, 989 F.2d 438, 441 (11th Cir.1993) ("[I]n a loan application case

involving misrepresentation of assets, the loss is the amount of the loan not repaid at the time the

offense is discovered, reduced by the amount the lender could recover from collateral"); see also,

<u>United States v. Schneider</u>, 930 F.2d at 558 ("actual loss" sustained by the victim is applied [i.e.,

credits for payments and mortgage security], and the "intended loss" is *not* considered for

---

> determining the "loss" sustained for sentencing purposes. <u>See, e.g.</u>, <u>U.S. v. Christopher</u>,
> 142 F.3d 46 (1st Cir. 1998); citing, <u>United States v. Kopp</u>, 951 F.2d 521, 531 (3d
> Cir.1991), and <u>United States v. Riley</u>, 143 F.3d 1289, 1291-92 (9th Cir.1998) (endorsing
> economic reality approach to sentencing).

sentencing [i.e., the total loan amount]); United States v. Smith, 951 F.2d at 1167 ("A thief who steals $100,000 is more culpable than a salesman who obtains $100,000 by selling a victim an $80,000 house that he fraudulently represents as being worth $100,000.").

Therefore, the calculation of loss should be determined by reduction of the amount the lending institution **has recovered** (or can expect to recover) **from any assets pledged to secure the loan** prior to sentencing. United States v. Kelley, 76 F.3d 436 (1st Cir. 1996); United States v. Bennett, 37 F.3d 687, 695 (1st Cir.1994). See also, United States v. Chorney, 63 F.3d 78 (1st Cir. 1995); United States v. Menichino, 989 F.2d 438, 441 (11th Cir.1993). In this case, the purchase price amount (if available) represents an approximation of the amount that the lending institution "can expect to recover" upon default of the loan. However, the fact that in at least one instance the purchase price unfairly reflects the fair market value of the collateral at the time of the offense **underestimates the credit** to be applied, and hence **overestimates the total loss**.

In addition, credit must be applied for the **amount actually recovered as a result of the pledged collateral**, i.e., via foreclosure of said pledged collateral prior to sentencing (as opposed to the approximate amount calculated by use of the purchase price). Id. In the present case, 17 of the 33 properties were sold at foreclosure, for a total amount of $865,433. The credit applied for these 17 properties was there cumulative purchase price, which came to a total of $444,550. Hence, the difference between the two figures creates an **overestimate of the total loss** in this case in the amount of $420,883. Subtracting this overestimated amount ($420,883) from the total loss figure provided by the PSR ($1,120,350), establishes that the actual Total Loss figure in this case was $699,467.[5] Hence the adjustment pursuant to USSG § 2B1.1 should be **a 14 level increase rather than 16.**

**2.     Further Deduction from the Total Loss Calculation must be made for monies**

---

[5]     Before further adjustment for credits as described hereafter.

9

### paid for repairs to the properties

Application note for § 2B1.1 at 2(E) states, "Credits against Loss.-Loss shall be reduced by the following: (i) The money returned... to the victim before the offense was detected." Although the Probation Department's PSR recognizes the fundamental principle that such credit should be given, it states in conclusory fashion that no such payments were made. However, Mr. McCarthy frequently returned to properties to perform repairs, and for at least one property made mortgage payments on behalf of the buyer. The total amount of these repair amounts comes to **$8,028.04.** The total amount of mortgage payments Mr. McCarthy made on behalf of the buyer comes to **$1,137.50.** (Please see attachments to McCarthy's Objection letter, dated September 27, 2006. Please be advised that due to an inadvertent miscalculation the amount of repairs was overstated by $5,042.09).

The credits and/or deductions for repairs and mortgage payments made by Mark McCarthy are as follows:

Mortgage Payments:

| | |
|---|---|
| RE: 34 Daytona St. - 5/15/00 | $568.95 |
| 6/16/00 | $568.95 |
| TOTAL MORTGAGE PAYMENTS | $1,137.90 |

Repairs:

| | |
|---|---|
| RE: 189 Bay Street | $2,975.00 |

*McCarthy paid Art Caldwell, a repairman who performed

substantial repair work. The attachment submitted with

McCarthy's Objection letter contained Caldwell's handwritten

notations itemizing the repair charges.

| | |
|---|---|
| RE: 149 Bowles Street - 10/18/99 | $ 274.85 |

*Mr. Rooter plumbing repair

10

| RE: 886-886 ½ Dwight Street - repairs | $ 526.84 |
| RE: 34 Daytona St. - numerous repairs | <u>$4,251.35</u> |
| TOTAL REPAIRS | <u>$8,028.04</u> |
| TOTAL | $9,165.94 |

In addition, the print-out of Albert Innarelli's IOLTA account furnished by the Government establishes that the buyers collectively received checks at the Closings totaling $83,367.06 for the purpose of making repairs on the 33 properties for which Mr. McCarthy was charged. Accordingly, the exclusion of these credits by the Probation Department in its PSR results in an **overestimation of the Total Loss Calculation of $92,532.60.**

In the Government's Response to Mark McCarthy's Objections to the PSR, the Government makes two arguments against allowing credit for the IOLTA checks issued for repairs. First, the Government acknowledges that the Buyers were not "victims", and therefore concludes that credit should not be given for money paid to the Buyers. This argument simply misses the point. The money was provided to make repairs to the *collateral* securing the loan, hence was returned to the Lender's benefit. Second, the Government argues that because the money came from the Lender, the Defendant should not get credit for how the money is spent. Again, the Government misses the point. Application note for § 2B1.1 at 2(E) states, "Credits against Loss.-Loss shall be reduced by the following: (i) The money *returned*... to the victim before the offense was detected." (Emphasis supplied). **In order for this credit to be applied, the money must have come from the Lender.** <u>Id.</u> Therefore, these monies that were returned to make repairs for the collateral properties must be credited.

## 3. The Total Loss Calculation overestimated the loss because it included a property with which Mark McCarthy had no involvement

The PSR calculation includes a property for which Mr. McCarthy had no involvement, 45

11

Montmorenci Street. Examination of the indictment provides no factual allegations whatsoever that Mr. McCarthy had any involvement in this property, and his name is incorrectly included for this Count of the Indictment. Mr. McCarthy received no proceeds from this transaction, was not an owner, was not the loan originator, and performed no other acts regarding this property. Accordingly, by inclusion of this property, Mr. McCarthy's total loss was overestimated by **\$40,964** (loan amount less purchase price). The burden of proof is on the Government to justify inclusion of a property

"Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by the plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." United States v. Booker, 543 U.S. 220 (2005); United States v. Yagar, 404 F.3d 967, 969 (6th Cir. 2005). Further, "the burden of persuasion and production...falls upon the government as a matter of due process to establish.. each aggravating factor upon which a harsher sentence is to be based." United States v. Agis-Meza, 99 F.3d 1052, 1055 (11th Cir. 1996). "When a defendant objects to a factual finding that is to be used as a basis for sentencing, the government bears the burden to establish the disputed fact by a preponderance of the evidence." Id. In finding facts under the Sentencing Guidelines, the "district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." United States v. Wilson, 993 F.2d 214, 218 (11th Cir. 1993). The Government bears the burden of supporting its loss calculation with "reliable and specific evidence." United States v. Cabrera, 172 F.3d 1287, 1292 (11th Cir. 1999).

With regard to 45 Montmorenci Street, the Government's response to Mr. McCarthy's objection constitutes mere speculation and is unsupported by the evidence. The Government argues that since Mr. McCarthy received a check issued in a series of checks regarding 45 Montmorenci Street in July, 2000, which ostensibly was when Mr. Matos purchased said

12

property at foreclosure, than he is culpable for the fraudulent transaction that Closed on December 28, 2000. One striking distinction regarding Check No. 9094 issued to Mr. McCarthy is that it bears **no** notation (it is blank) in the "MEMO" column of Innarelli's IOLTA account, whereas **all** of the other checks issued in that series have notations regarding 45 Montmorenci Street under the "MEMO" column. In fact, a close examination of Innarelli's IOLTA account regarding the thirty-three (33) properties in which Mr. McCarthy is named in the Superseding Indictment reveals he was issued a total of fifty (50) checks and that on **every** other occasion besides 45 Montmorenci Street, or 49 other issuances, a notation exists under the "MEMO" column identifying the property to which it relates.

Moreover, the Closing for 45 Montmorence Street occurred on December 28, 2000, more than four (4) months after July 20, 2000. At the time of the Closing on December 28, 2000, two (2) checks were issued regarding 45 Montmorenci Street: Check Nos. 10027 & 10028, were issued to Anthony Matos and George A. Petropoulos, respectively. **No** check whatsoever was issued to Mr. McCarthy on or around December 28, 2000. Co-Defendant, Catherine Zepka, and not Mr. McCarthy, handled the loan for that transaction.

Finally, Mr. McCarthy accepted responsibility and tendered a guilty plea in this matter. He has not attempted to shirk his responsibility here. He denies vehemently, however, any involvement whatsoever with 45 Montmorenci Street. Therefore, based upon the above, it is unreasonable to infer that said Check No. 9094 relates in any manner or way to 45 Montmorenci Street. In short, the Government has no reliable evidence to establish by a preponderance of the evidence that Mr. McCarthy was involved in the 45 Montmorenci Street transaction, and therefore, it fails to meet its burden of proof regarding this property on the issue of loss as it relates to Mr. McCarthy.

**4.    The Total Loss Calculation overestimated the loss because it provided no**

13

### purchase price for the premises located at 102-104 Cedar Street

Examination of Exhibit A to the PSR provides that for the premises known as and located at 102-104 Cedar Street, the loan amount provided was $80,000 with no purchase price listed. Because the Probation Department had no purchase price, no credit is given for the property's value in order to reflect the "actual loss" to the lender. (Ex. A to the PSR, p.6).[6] The factual underpinnings for this property are that it was originally purchased by a co-conspirator, Romeo, approximately ten (10) or more years prior to the transaction that gives rise to the indicted offense.[7] As a result of the lack of purchase price, and the absence in the PRS of any alternative method of determining the collateral's value in order to calculate the "actual loss", the PSR attributes the entire loan proceed of $80,000 against Mr. McCarthy.

Because there is no purchase price value nor, in this case, a foreclosure price value, determination of the collateral's value is not readily available. However, this particular transaction provides a very reliable calculation of value for the mortgage property in this instance. When the transaction was submitted for loan approval, it was accompanied by an appraisal indicating a value of $120,000 (by Authier & Bigos Appraisal Company, Inc.). The Lender in this case (Option One) decided that it wanted an independant third-party appraisal to be performed. **Fitzgerald & Company** performed this appraisal on behalf of the Lender, and determined its fair market value was **$100.000**. The independently appraised value of $100,000 most fairly reflects the fair market value of the property at the time of the offense. United States v. Kelley, 76 F.3d 436 (1st Cir. 1996); United States v. Bennett, 37 F.3d 687, 695 (1st Cir.1994). See also, United

---

6    In its Response to the Defendant's objections to the PSR, the Government asserts that the purchase price listed is One ($1.00) Dollar.

7    Hence, use of a purchase price some ten years or more prior to the offense would bear no indicia of reliability to calculate the value of the collateral in any event.

14

States v. Chorney, 63 F.3d 78 (1st Cir. 1995); United States v. Menichino, 989 F.2d 438, 441

(11th Cir.1993).

Even if the Government's assertion that the actual purchase price was $1.00 was correct, it certainly fails to accomplish the purpose of the *Starnes* method of accurately evaluating "actual loss". Such figure of $1.00 would not reflect the value of the collateral, and hence merely deducting this amount would cause an over-estimation of the loss. Indeed, based on the PSR's treatment of this transaction., **the PSR overestimates the Total Loss figure by $80,000.**

**5.    Taking into account the collateral values and credits necessary for a correct evaluation of the Total Loss incurred in this case provides that the "actual loss" in this case was $485,970.40.**

Taking into account the collateral values via foreclosure to calculate "actual loss," the

credits for repairs and mortgage payments made, the exclusion of loss for which Mr. McCarthy

was not involved with, and the value of collateral for the property which received no deduction for

purchase price, the Total Loss sustained in the present case is determined as follow:

|      |   |              |                      |
|------|---|--------------|----------------------|
|      |   | $1,120,350.00 | (Per PSR Report)     |
| Less | $ | 420,883.00   |                      |
|      | $ | 92,532.60    |                      |
|      | $ | 40,964.00    |                      |
|      | $ | 80,000.00    |                      |
|      | $ | 485, 970.40  | Corrected Total Loss |

Hence, the USSG § 2B1.1(b) the "Specific Offense Characteristics," provides that there

should be **a 14 level increase rather than 16.**

**B.    THE PROBATION DEPARTMENT ERRED BY ASSESSING A TWO-LEVEL**

## INCREASE ON THE GROUNDS THAT UNDER USSG § 2B1.1, THE OFFENSE INVOLVED MORE THAN 10 BUT LESS THAN 50 VICTIMS

The PSR incorporated a two-level enhancement under USSG § 2B1.1, on the grounds that the offense involved more than 10 but less than 50 victims. Application Note 3(A)(ii) defines a "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)." The term "actual loss" is defined as "the reasonably foreseeable **pecuniary** harm that resulted from the offense." Application Note 2(A)(i). (Emphasis supplied). **Furthermore, "pecuniary harm" is defined as "harm that is monetary or that otherwise is readily measurable in money" and "does not include emotional distress, harm to reputation, or other non-economic harm."** Under Application Note 2(D)(i), certain damages are excluded from "actual loss," such as "interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs."

In conclusory fashion, the Report states that "six different lending institutions and approximately thirty-three individual victim-buyers suffered a loss due to the conspirators' actions." However, no factual evidence is provided establishing whether said lending institutions actually suffered a **pecuniary** loss, and likewise no factual evidence is provided establishing that the "victim-buyers" (as the PSR labels the buyers) actually suffered a pecuniary loss.

In its response to the Defendant's Objections to the PSR, the Government first asserts that "...the buyers were not victims in this case." (See Government's Response to Objection 26(B)). The Government then attempts to have it both ways when it asserts, vaguely to be sure, that because the buyers bought homes at a higher price than their fair value, they automatically suffered pecuniary loss. (See Government's Response to Objection 27). It is exactly these type of generalized assertions and mushy speculations that the Courts have rejected for failure to meet the requisite standard for determining whether the alleged victim suffered pecuniary loss.

"Any fact (other than a prior conviction) which is necessary to support a sentence

16

exceeding the maximum authorized by the facts established by the plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." United States v. Booker, 543 U.S. 220 (2005); United States v. Yagar, 404 F.3d 967, 969 (6th Cir. 2005). Further, "the burden of persuasion and production...falls upon the government as a matter of due process to establish.. each aggravating factor upon which a harsher sentence is to be based." United States v. Agis-Meza, 99 F.3d 1052, 1055 (11th Cir. 1996). "When a defendant objects to a factual finding that is to be used as a basis for sentencing, the government bears the burden to establish the disputed fact by a preponderance of the evidence." Id. In finding facts under the Sentencing Guidelines, the "district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." United States v. Wilson, 993 F.2d 214, 218 (11th Cir. 1993). The Government bears the burden of supporting its loss calculation with "reliable and specific evidence." United States v. Cabrera, 172 F.3d 1287, 1292 (11th Cir. 1999).

**Because a finding under the Guidelines must be based on reliable information and a preponderance of the evidence, see U.S.S.G. § 6A1.3, commentary, the Report does not have a proper factual basis to apply an enhancement under section 2B1.1(b)(2)(A).** See, e.g., United States v. Lewis, 88 Fed.Appx. 898, 902, 2004 WL 376828 (6th Cir. Feb.27, 2004) (concluding that evidence was not sufficient to support an enhancement based on the number of victims where no specific evidence that alleged victims actually suffered pecuniary harm – "mere allegation in PSR that seven individuals were victims of Lewis's conduct is not sufficient proof that seven individuals suffered 'actual loss' within the meaning of the guidelines' language"); United States v. Gray, 71 Fed.Appx. 300, 301, 2003 WL 21683709 (5th Cir. July 18, 2003) (concluding that number-of-victims adjustment under section 2B1.1(b)(2)(A) was wrongly applied where there was insufficient evidence to support district court's conclusion that the underlying offense involved more than ten victims). See also, United States v. Mohammed, 315

17

F.Supp.2d 354 (S.D.N.Y.,2003) (enhancement not appropriate where evidence did not establish that individual credit card holders suffered a pecuniary loss, although evidence supported finding that seven credit card companies suffered pecuniary loss); United States v. Ware, 2005 WL 3663483 (2005) (insufficient evidence regarding pecuniary loss suffered by the "approximately 30" alleged victims).

In addition, it is conjectural to treat the buyers as "victim" under this provision of the Guidelines enhancement because in most, if not all, the buyers were complicit in the fraud. Because these "buyer-victims" were actually co-conspirators, with the shared fraudulent intent to defraud the lender, the actual "victim" of the offenses were the lenders, not the buyers. See, e.g., United States v. Mnfre, 368 F.3d 832 (8th Cir. 2004) (co-conspirator in arson case was not a victim because the target of the offense, i.e., the real victim, was the insurance company that was the target of the offense). Based on the determination that in this case that the buyer's were not victims in this case, there is no justification for a two-level sentencing enhancement under 2B1.1(b)(2)(A).

## C.   THE PROBATION DEPARTMENT ERRED BY ASSESSING A TWO-LEVEL INCREASE ON THE GROUNDS THAT UNDER USSG § 3B1.3, MARK McCARTHY ABUSED A POSITION OF PUBLIC OR PRIVATE TRUST

The PSR incorporated a two-level enhancement under USSG § 3B1.3, on the grounds that the defendant, Mark McCarthy, abused a position of public or private trust. In conclusory fashion, the Report states that as a mortgage broker,[8] he occupied a position of trust "as the lending institutions are compelled to take the broker's at their word," and that the defendant occupied a position "given considerable deference and offers little supervision." No factual evidence is provided establishing that Mr. McCarthy actually occupied a position of trust as stated in the PSR.

[8]    It is important to reiterate that Mark McCarthy was actually a "loan originator," not a "mortgage broker."

18

"Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by the plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." United States v. Booker, 543 U.S. 220 (2005); United States v. Yagar, 404 F.3d 967, 969 (6th Cir. 2005). Further, "the burden of persuasion and production...falls upon the government as a matter of due process to establish.. each aggravating factor upon which a harsher sentence is to be based." United States v. Agis-Meza, 99 F.3d 1052, 1055 (11th Cir. 1996). "When a defendant objects to a factual finding that is to be used as a basis for sentencing, the government bears the burden to establish the disputed fact by a preponderance of the evidence." Id. In finding facts under the Sentencing Guidelines, the "district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines." United States v. Wilson, 993 F.2d 214, 218 (11th Cir. 1993). The Government bears the burden of supporting its loss calculation with "reliable and specific evidence." United States v. Cabrera, 172 F.3d 1287, 1292 (11th Cir. 1999).

Preliminarily, the PSR misconstrues the role of a mortgage broker (much less a "loan originator") as opposed to, for example, an appraiser. A mortgage broker does not recommend whether the lending institution should approve a loan. A mortgage broker does not vouch for a loan applicant, or otherwise opine to the lender as to whether a particular applicant is worthy of the loan. Indeed, a mortgage broker has no decision-making or recommending authority. On the contrary, a mortgage broker compiles the paperwork for submission, for the lending institutions' determination of whether a loan should be approved (contrast a appraiser, who gives his opinion as to value of the property, for which the lender does not make its own determination of property value). Although the lender relies on the mortgage broker not to falsify documents, that reliance is not dependent upon a "position of public or private trust" as defined by the Guidelines.

This distinction is demonstrated by the Commentary to the Guidelines, which provides

19

that a position of public or private trust for purposes of the sentencing guidelines is one "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." USSG section 3B1.3 (application note 1). The adjustment would apply "in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." Id. The adjustment does not apply to a theft or embezzlement by an ordinary bank teller or hotel clerk, because such positions are not characterized by professional or managerial discretion. Id.

Applied to the present case, a mortgage broker has no professional or managerial discretion regarding whether a particular loan will be approved. As a "loan originator," Mark McCarthy had no professional or managerial discretion whatsoever. Accordingly, as a matter of law, Mark McCarthy cannot be held to a sentencing enhancement based upon USSG section 3B1.3.

In United States v. Williams, 993 F.2d 1224 (6th Cir. 1993), for example, an adjustment for abuse of trust was overturned for a manager in a federal agency who admitted to embezzling money from the agency. The court found that the defendant had commenced her embezzlement while still a "regular" employee, and that her subsequent promotion to a managerial position did not transform the nature of the offense. Williams, 993 F.2d at 1227. In United States v. Jolly, 102 F.2d 46 (2d Cir. 1996), the Second Circuit overturned an abuse of trust enhancement against a mail fraud defendant who held himself out as the president of a company seeking capital in the form of loans from investors. The court reasoned that "arms length" commercial transactions involving contractual obligations are not ordinarily subject to the enhancement. Id. at 49. In United States v. Custodio, 39 F.3d 1121 (10th Cir. 1994), a physician convicted of fraudulently billing the government for services not actually performed was found to not have abused a position of trust, because the difficulty in detecting the offense stemmed from the complexities of